[Cite as *State v. Cox*, 2013-Ohio-4941.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                        :

    Plaintiff-Appellee                          :               C.A. CASE NO.    25477

v.                                                            :               T.C. NO.    11CR2557

VERNON LEE COX, JR.                           :               (Criminal appeal from
                                             Common Pleas Court)

    Defendant-Appellant                        :

                                                                  :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the    8th    day of      November     , 2013.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

GEORGE A. KATCHMER, Atty. Reg. No. 0005031, 1886 Brock Road N.E., Bloomingburg, Ohio 43106
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    Defendant-appellant Vernon L. Cox appeals his conviction and sentence for

the following offenses, to wit: 1) two counts of rape of a child under thirteen years of age, in

violation of R.C. 2907.02(A)(1)(B), all felonies of the first degree; 2) two counts of gross sexual imposition of a child under thirteen years of age, in violation of 2907.05(A)(4), all felonies of the third degree; 3) six counts of sexual battery (parent), in violation of 2907.03(A)(5), all felonies of the third degree; 4) one count of GSI (by force), in violation of R.C. 2907.05(A)(1), a felony of the fourth degree; and 5) four counts of rape (by force or threat of force), in violation of 2907.02(A)(2), all felonies of the first degree. Cox filed a timely notice of appeal with this Court on November 15, 2012.

{¶ 2} The facts of the instant case arise from several separate instances of sexual abuse of the victim, C.F., by her stepfather, Cox. According to C.F., who testified at trial, the abuse allegedly occurred from the time she was six years old until she turned fourteen years old. Cox married C.F.'s mother, G., on May 15, 1999. Prior to and during the marriage, C.F. and her two brothers lived with G. and Cox at his residence located on Rosebury Drive in Huber Heights, Ohio. Cox also had three minor children from a prior relationship who lived at the Rosebury residence during this time.

{¶ 3} Cox and G. divorced in 2001. G. moved with her children to an apartment located at Orchard Hill Drive in Miamisburg. A few months after the divorce, Cox and G. started seeing each other again, and Cox began routinely splitting time between the Orchard Hill apartment and his residence on Rosebury Drive. Cox and G. remarried in 2005.

{¶ 4} At trial, C.F., who was eighteen years of age at the time of the trial, testified regarding the following five separate instances during which she was sexually abused by Cox:

{¶ 5} **C.F.'s "Dolphin" Bedroom at Orchard Hill**

**{¶ 6}** When C.F. was between the ages of six and nine, Cox worked third shift and would get home around 6 a.m. when everyone would still be asleep. C.F. testified that one morning, Cox came home and got in bed with her. After touching her vagina over her sweat pants and underwear, Cox removed C.F.'s pants and touched her vagina with his tongue while she pretended to be asleep. C.F. further testified that she tried to move away from him, but Cox continued the sexual assault. This incident formed the basis for Counts I and II (rape of a child under thirteen and sexual battery) in the "B" indictment.

**{¶ 7}** **C.F.'s Ninth Birthday at Rosebury Drive**

**{¶ 8}** On C.F.'s ninth birthday, Cox took her to Wal-Mart so that she could get a present. Cox and C.F. then returned to his house on Rosebury Drive. Once there, Cox wrestled C.F. to the ground and touched her vagina over her clothing. C.F. resisted, but Cox picked her up, high enough to where she hit her head on a ceiling fan. Cox took C.F. to his bedroom and gave her a bag of frozen peas to put on her head.

**{¶ 9}** While she pretended to be asleep, Cox removed her pants and underwear and touched her vagina using his fingers. C.F. testified that Cox also inserted his fingers into her vagina. C.F. testified that she tried to move away from him, but Cox did not stop. Cox then made C.F. touch his erect penis while moving her hand up and down. C.F. testified that she did not resist because she was scared of being punished by Cox who occupied the position of disciplinarian in their household. This incident formed the basis for Counts II and III (both GSI of a child under thirteen) and Counts IV and V (rape of a child under thirteen and sexual battery) in the "A" indictment.

**{¶ 10}** **Cox's Bedroom at Rosebury with M.C. Present**

{¶ 11}   C.F. further testified that when she was approximately eleven or twelve years of age, Cox took her and one of his biological daughters, M.C., out for dinner and a movie.   After the movie, Cox took the girls back to the house on Rosebury Drive.   Once home, Cox and the two girls went to his room and laid on the bed while watching television.  C.F. testified that M.C. fell asleep between Cox and herself.   At some point, Cox moved M.C. so that he was lying next to C.F.   While C.F. was pretending to be asleep, Cox removed her sweat pants and underwear, after which he used his fingers to penetrate her vagina.   Cox then inserted his penis in C.F.'s vagina but was not able to get it in very far. C.F. testified that this was very painful.   Cox also put his mouth on C.F.'s vagina.  C.F. testified that M.C. did not wake up during the entire incident.

{¶ 12}   This incident formed the basis for Counts VII and VIII of the "A" indictment (rape by force and sexual battery – digital penetration), Counts IX and X of the "A" indictment (rape by force and sexual battery - penile penetration), and Counts V and VI of the "B" indictment (rape by force and sexual battery – cunnilingus).

{¶ 13}   **The Kitchen at Orchard Hill**

{¶ 14}   When C.F. was between twelve and fourteen, Cox would play a game with her before school where he would blindfold her and put jell-o or yogurt on a spoon and make her taste it.   If C.F. guessed what was on the spoon correctly, then Cox would give her an additional $5.00 to put towards her lunch money.   On one morning before school when no one else was present, Cox had C.F. play the game with him.   However, instead of placing jell-o or yogurt on a spoon and in her mouth, Cox placed his penis in C.F.'s mouth.   C.F. testified that she could see Cox's penis from underneath the blindfold.   C.F. further testified

that Cox told her to "taste it better" and use her tongue to lick it.

{¶ 15} This incident formed the basis for Counts III and IV of the "B" indictment (rape by force and sexual battery – fellatio).

{¶ 16} **The Dirt-Biking Incident**

{¶ 17} When C.F. was between the ages of eleven and fourteen, Cox would take her and most of the other children to ride dirt bikes near an area called Jackass Flats. Because they only had one dirt bike, the children would take turns riding it. On one such occasion, it was C.F.'s turn to ride the bike. Because of her inexperience with the dirt bike, Cox rode with her. C.F. rode the bike down a trail until Cox asked her to stop so that he could use the bathroom. C.F. stopped the bike, and Cox went into the woods for moment. When he returned, Cox began asking C.F. questions about her vagina and whether she had grown any "pubes." At that point, Cox wrestled C.F. to the ground, put his hand down her pants, and inserted his finger into her vagina. C.F. testified that she screamed and Cox got off of her. C.F. further testified that she tried to run away, but Cox caught up with her, said he was sorry, and put her back on the bike. Once they returned to the other children, C.F. called her mother. Cox eventually explained to G. that nothing happened and the C.F. was just being overly dramatic. This incident formed the basis for Count VI (GSI by force) in the "A" indictment.

{¶ 18} On May 25, 2010, towards the end of her sophomore year in high school, C.F. informed Jennifer Brockert of some the abuse that she had suffered at the hands of Cox. Brockert is an intervention specialist and special education teacher at C.F.'s high school. Brockert had been assigned to help C.F. during her freshman year in high school with

behavioral problems that she exhibited. Over time, C.F. came to trust Brockert enough to confide in her. After C.F. disclosed some of the sexual abuse perpetrated by Cox, Brockert took the information to a police officer at the high school, and an investigation commenced.

{¶ 19} On December 6, 2011, Cox was indicted for two counts of rape of a child under the age of thirteen, two counts of rape by force or threat of force, three counts of sexual battery by a parent, two counts of GSI of a child under the age of thirteen, and one count of GSI by force or threat of force. "A" Indictment. On May 16, 2012, the State filed a "B" indictment charging Cox with the following offenses: one count of rape of a child under the age of thirteen, two counts of rape by force or threat of force, and three counts of sexual battery by a parent.

{¶ 20} After the trial court ruled on several pre-trial motions, the case proceeded to jury trial in early October of 2012. Counts II through X of the "A" indictment and counts I through VI of the "B" indictment were tried to the jury. Cox was ultimately found guilty on all of the counts.[1] After merging various counts in both the "A" and "B" indictments, the trial court sentenced Cox to an aggregate thirty years in prison.

{¶ 21} It is from this judgment that Cox now appeals.

{¶ 22} Because they are interrelated, Cox's first and third assignments of error will be discussed together as follows:

{¶ 23} "THE STATE PRESENTED INSUFFICIENT EVIDENCE OF FORCE RELYING ON GENERALIZED STATEMENTS AND NON-SEXUAL INCIDENTS TO

---

[1]On November 9, 2012, Cox separately pled guilty to rape of a child under the age of thirteen, as charged in Count I of the "A" indictment, which involved a second victim, A.C.

SUPPORT ITS CLAIM OF THE USE OF FORCE."

{¶ 24} "THE COUNTS CONCERNING RAPE BY FORCE MUST BE REVERSED BECAUSE THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 25} In his first assignment, Cox contends that the State adduced insufficient evidence to establish the element of force or threat of force to convict him of forcible rape. Additionally, Cox argues in his third assignment that the his convictions for rape by force or threat of force were against the manifest weight of the evidence. As previously noted, Cox was charged with committing four counts of rape by force or threat of force in Counts VII and IX of the "A" indictment and Counts III and V of the "B" indictment.

{¶ 26} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101,112, 2005-Ohio-6046, 837 N.E.2d 315. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' (Internal citations omitted). A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily

against the conviction.'" *Id*.

**{¶ 27}** The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

**{¶ 28}** This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

**{¶ 29}** Cox was convicted of four counts rape in violation of R.C. 2907.02(A)(2), in that he engaged in sexual conduct with another, purposely compelling the other person to submit by force or threat of force. In *State v. Eskridge*, 38 Ohio St. 3d 56, 526 N.E.2d 304 (1988), the Ohio Supreme Court held that the force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength. In *Eskridge*, the Court noted the age

difference and disparity in size between Eskridge and his four-year old daughter who was the victim. Chief Justice Moyer noted the following at page 58 of the Court's opinion:

> We also recognize the coercion inherent in parental authority when a father sexually abuses his child. "***Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established. *State v. Martin* (1946), 77 Ohio App. 553 [33 O.O. 364]; *State v. Wolfenberger* (1958), 106 Ohio App. 322 [7 O.O. 2d 73]. In the within case, we are confronted with a child being told to do something by an important figure of authority, and commanded not to tell anyone about it. In such a case, we find nothing unreasonable about a finding that the child's will was overcome. Consequently, the forcible element of rape was properly established." *State v. Fowler* (1985), 27 Ohio App. 3d 149, 154, 27 OBR 182, 187, 500 N.E. 2d 390, 395.

{¶ 30} In *State v. Hiles*, 2d Dist. Montgomery No. 13803, 1994 WL 43102 (Feb. 11, 1994), we sustained the defendant's conviction of six counts of gross sexual imposition in violation of R.C. 2907.05 (A)(1). The victim of Hiles' conduct was his fifteen year old daughter. His sexual conduct included the caressing of her body, including her buttocks and breasts, while he and his daughter were in bed, or on a couch, or the floor. On another occasion, he rubbed her body with lotion including her buttocks and breasts. The daughter testified she never expressed an objection to or resisted her father's behavior, because he threatened to kill her if she reported the activity. Judge Grady wrote on behalf of this court

in *Hiles*, at *3:

> At the time of these offenses A.H. was fifteen and sixteen years of age. If the rule of law espoused in *Eskridge* applies at all in this case, it would not apply as it might if the child victim was much younger. The necessary element of force required by R.C. 2907.05(A)(1) is not satisfied by the mere fact that the offender is the victim's parent or by some subjective belief or feeling on the part of the victim that submission is required. Some showing by the State that the offender, through his own acts, compelled the victim to submit to sexual contact by "force or threat of force," however slight, is required.

We affirmed the defendant's convictions in *Hiles* because the victim testified she did not resist him because she feared what he might do to her.

{¶ 31} The facts in the instant case mirror those set forth in *State v. Marrs*, 2d Dist. Montgomery No. 18903, 2002-Ohio-3300. In *Marrs*, the female victim was eleven years old when the defendant, her step-father, raped her. The defendant was known as a strict disciplinarian in the home and often punished the victim for disobedience by spanking her or grounding her for months at a time. *Id.* When the rape occurred, the defendant entered the victim's room while she was asleep and took her underwear off. *Id.* The victim woke up while the defendant was performing oral sex on her. *Id.* The victim testified that she did not want the defendant to do what he was doing, but she felt that she had no choice. *Id.* The victim further testified that she was afraid of the defendant because he was in charge of the home, and he was the person who punished her. *Id.* The victim believed that she would get

into more trouble if she attempted to stop him. *Id.* The defendant had also told the victim to remain silent regarding the abuse or he would make her look like a liar. *Id.*

{¶ 32} Like the defendant in *Marrs*, Cox was C.F.'s step-father. C.F. was approximately eleven or twelve years old when Cox committed the three rapes (digital, oral, and penile) in his house on Rosebury Drive when M.C., C.F.'s step-sister, was present but asleep in the same bed. During that incident, Cox removed C.F.'s pants and underwear before he inserted his finger into her vagina. Cox then penetrated C.F.'s vagina with his penis, after which he placed his mouth on her vagina.

{¶ 33} C.F. testified that she was between the ages twelve and fourteen when Cox forced her to engage in oral sex during the incident in the kitchen at the Orchard Hill apartment. During this incident, Cox blindfolded C.F. and directed her on how to perform after he placed his erect penis in her mouth. Specifically, C.F. testified that "he was telling me to taste it better. I would – I need to use my tongue and like lick it or whatever."

{¶ 34} Cox was also the primary disciplinarian and father figure in the house. C.F. testified that she was physically afraid of him. C.F. and her brother, A.C., testified that Cox was strict and that when they got into trouble, he punished them by forcing them to stand in a line and pull their pants down. Cox would then "whoop" them with a belt. C.F. testified that there was a rule in the house that the children could not say "no" to Cox. C.F. testified that she did not want Cox to touch her, but she thought she would get into more trouble if she tried to stop him. C.F. further testified that she was afraid of the financial consequences to her family if she attempted to stop Cox from raping her because he was their "livelihood." C.F. testified that Cox used to say "[m]y way or the highway" because he was the "ruler" of

the house. Moreover, C.F. testified that on occasion, she attempted to hint to her mother regarding the abuse that was being inflicted upon her by Cox. C.F. testified that her mother would always tell Cox about the hints, and thereafter, her punishments would increase in severity.

{¶ 35} Construing the evidence presented in a light most favorable to the State, as we must, we conclude that a rational trier of fact could find all of the essential elements of the crime of rape to have been proved beyond a reasonable doubt, including that Cox compelled C.F. to submit by force or threat of force. Cox's convictions are supported by legally sufficient evidence.

{¶ 36} Finally, Cox's convictions are not against the manifest weight of the evidence. The credibility of the witnesses and the weight to be given their testimony were matters for the court to resolve. The trial court did not lose its way simply because it chose to believe the testimony of the victim, C.F., who testified at length regarding Cox forcing her to submit to multiple instances of digital, oral, and penile rape. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against a conviction, or that a manifest miscarriage of justice has occurred.

{¶ 37} Cox's first and third assignments of error are overruled.

{¶ 38} Because they are interrelated, Cox' second and fourth assignments of error will be discussed together as follows:

{¶ 39} "THE COUNTS IN THE INDICTMENTS CONCERNING PENILE PENETRATION MUST BE REVERSED DUE TO THE INSUFFICIENCY OF THE EVIDENCE."

{¶ 40} "THE COUNTS IN THE INDICTMENTS CONCERNING PENILE PENETRATION MUST BE REVERSED BECAUSE THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 41} In his second assignment, Cox asserts that the State presented insufficient evidence of penile penetration to satisfy the sexual conduct element in Count IX of the "A" indictment. Specifically, Cox argues that C.F.'s testimony demonstrates that she was unsure and confused regarding whether Cox inserted his penis into her vagina. Thus, Cox asserts that, pursuant to the standard we set forth in *State v. Lucas*, 2d Dist. Montgomery No. 18644, 2001-Ohio-1350, C.F.'s testimony about the vaginal rape that occurred at Rosebury was insufficient to establish that penile penetration occurred. In his fourth assignment, Cox contends that the jury's finding that he vaginally raped C.F. using his penis was against the manifest weight of the evidence.

{¶ 42} R.C. 2907.01(A) states as follows:

(A) "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. *Penetration, however slight, is sufficient to complete vaginal or anal intercourse.*

{¶ 43} *Lucas* involved a charge of vaginal rape. 2d Dist. Montgomery No. 18644, 2001-Ohio-1350. The evidence showed that the defendant had rubbed his penis across the victim's vaginal area. We held that the evidence was insufficient to show penetration, and

that in order to prove vaginal rape there must be evidence that the force of the object caused the labia, which form the outer lips of the victim's vagina, to spread. *Id.* Absent that, and depending on the circumstances, only attempted vaginal rape is shown.

{¶ 44} In the instant case, C.F. testified as follows regarding the penile rape that occurred at Rosebury Drive while her step-sister was present in the bed but sleeping:

The State: With respect to he [Cox] put his fingers inside of you, and then you said he also used his penis. Was he dressed or not dressed?

C.F.: He had his pants unbuttoned. Or his pants like he [sic] penis was out.

Q: I'm sorry.

A: His penis was out, but he had his pants on still a little bit, I think.

Q: And do you remember whether his penis was soft –

A: It was hard.

Q: It was hard. And what did you do with his penis?

A: He tried to put it inside me but being so young, I guess it didn't exactly work out that way.

Q: Okay. So he tried to put it inside. Okay. *I'm going to ask you a couple more questions about what you mean by that.* Did his penis make contact with your vagina?

A: Yes.

Q: *Did he at any point start pushing it in your vagina?*

A: *He tried.*

Q: *Did it get in your vagina at all?*

A: *I mean a little bit but it – I was so small as a kid*, *I mean I don't know.   I*

*don't –*

Q: It –

A: *It did. It – he tried, but it didn't go all the way in*.

Q: *So it got in a little bit*.

A: *Yes*.

Q: And how did that feel for you?

A: It didn't feel good.   It hurt.

Q: Worse than the fingers?

A: Yes.

**{¶ 45}**   Penetration of the vaginal cavity requires introduction of an object from without, which necessarily implies some forceful spreading of the labia majora.   The penetration need only be "slight."   R.C. 2907.01(A).   Therefore, if the object is introduced with sufficient force to cause the labia majora to spread, penetration has occurred.   C.F.'s testimony, if believed, is sufficient to permit the jury to reasonably conclude that Cox's conduct in inserting his penis "a little bit" into C.F.'s vagina necessarily caused the labia majora to spread. C.F.'s testimony was not confusing nor was she unsure whether Cox had penetrated her vagina with his penis.   C.F. was only explaining that because she was young and small when the rape occurred, Cox was only able insert his penis a little bit into her vagina.   C.F.'s testimony is legally sufficient to establish vaginal penetration to support Cox's's conviction for rape.   *Lucas*, 2d Dist. Montgomery No. 18644, 2001-Ohio-1350.

**{¶ 46}**   Further, Cox's conviction for rape is not against the manifest weight of the

evidence. The trial court did not lose its way simply because it chose to believe C.F. who affirmatively testified that Cox penetrated her vagina with his penis while at his house on Rosebury Drive. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against a conviction, or that a manifest miscarriage of justice has occurred.

{¶ 47} Cox's second and fourth assignments of error are overruled.

{¶ 48} Cox's fifth assignment of error is as follows:

{¶ 49} "AN EXPERT WITNESS MUST DERIVE HER OPINION FROM FACTS OR DATA OF THE PARTICULAR CASE UPON WHICH THE EXPERT BASES AN OPINION OR INFERENCE."

{¶ 50} In his fifth assignment, Cox argues that the trial court abused its discretion when it admitted the expert testimony of Dr. Brenda J. Miceli, a clinical child psychologist, who testified at trial regarding the behavioral characteristics of children who have been sexually abused. Specifically, Dr. Miceli testified regarding delayed reporting and partial reporting of sexual abuse in children.

{¶ 51} Evid. R. 702 governs the admissibility of expert testimony. It provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the

testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

**{¶ 52}** "[T]he Ohio Supreme Court has found that testimony from a psychologist on the behavioral characteristics of sexually abused children is admissible, see *State v. Stowers* (1998), 81 Ohio St.3d 260, 262, 690 N.E.2d 881, and so have we. [*State v.Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280 (2d Dist.)]." *State v. Rosas,* 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 41. "What an expert may not do is offer a direct opinion on whether a child is telling the truth. *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220." *Id.*, ¶ 42. We review the admission of expert testimony under an abuse of discretion standard of review. *See Bell*. In *Bell,* Dr. Miceli was retained by the State "to testify regarding the wide range of behaviors that sexually abused children may exhibit, including internalizing behaviors, externalizing behaviors, and sexualized behaviors." Miceli did not opine on whether the victims were sexually abused by the defendant, and this Court concluded that the trial court did not abuse its discretion in admitting the testimony as follows:

Dr. Miceli simply offered her opinions regarding the wide range of behavioral characteristics displayed by minor victims of sexual abuse. The law clearly permits this kind of expert testimony, and Dr. Miceli did not go beyond permissible boundaries and opine whether these children were in fact abused by Bell. A thorough review of Dr. Miceli's expert testimony establishes that she possessed specialized knowledge that could aid a trier of

fact in assessing whether the children actually suffered sexual abuse. *Bell*, ¶ 57.

**{¶ 53}** In the instant case, Dr. Miceli testified regarding some of the behaviors that sexually abused children may exhibit, including the tendency to delay the reporting of sexual abuse. Dr. Miceli also offered testimony regarding the tendency of children who have been sexually abused to only provide partial reports of the alleged abuse. Cox argues that Dr. Miceli failed to disclose the facts and data used as a basis for her opinion, as required by Evidence Rule 705. Dr. Miceli, however, did not opine as to whether C.F. had, in fact, been abused. Instead, Dr. Miceli's testimony was limited by the trial court to a specialized overview of particular behavioral characteristics of sexually abused children in order to give the jurors a better understanding of those characteristics. Accordingly, Dr. Miceli's testimony regarding the behavioral characteristics displayed by minor victims of sexual abuse was admissible to aid the jury in assessing whether C.F. actually suffered sexual abuse at the hands of Cox. See *State v. Weber*, 2d Dist. Montgomery No. 25508, 2013-Ohio-3172.

**{¶ 54}** There is little doubt that Dr. Micelli possesses extensive formal education and broad, deep experience with sexually abused children. Her testimony here establishes this, and we have previously so found. See *State v. Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578 (recognizing Dr. Micelli's extensive experience with sexually abused children). After examining the record, we find nothing that would call into question the reliability of her testimony. Her testimony on the behavioral characteristics of sexually-abused children has a reliable basis in the knowledge and experience of the field of psychology, which she has acquired from the classroom and the clinic.

**{¶ 55}** Cox also asserts that the State called Dr. Miceli to testify solely to bolster C.F.'s testimony. There is a distinction "between expert testimony that a child witness is telling the truth," on the one hand, and on the other hand, "evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused." *Stowers*, at 262. Expert testimony is admissible as to the latter. This is evidence that provides "additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." *Id.* Such testimony "does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination." Id. at 263. Here, Dr. Miceli's testimony is within permissible bounds. She testified about the behavioral characteristics of sexually abused children in an effort to educate the jury regarding delayed and partial reporting of sexual abuse by children.

**{¶ 56}** Finally, Dr. Miceli's testimony regarding those defendants who sexually abuse their victims in the presence of another sleeping was also admissible. Specifically, Dr. Miceli testified that she was aware of scenarios such as this and explained that the abuser felt like he had equal control over both children, the victim and the sleeping child. Based on her extensive and specialized knowledge in the area of child sexual abuse, Dr. Miceli's testimony was admissible and relevant because it provided the jury with information regarding the behavior and modus operandi of those who sexually abuse children. Dr. Miceli's testimony also provided the jury with a basis to assess C.F.'s credibility with respect to her testimony that M.C. was sleeping in the same room when Cox raped her.

**{¶ 57}** Cox's fifth assignment of error is overruled.

**{¶ 58}** Cox's sixth assignment of error is as follows:

{¶ 59} "APPELLANT'S CONVICTION MUST BE REVERSED DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL."

{¶ 60} In his sixth assignment, Cox contends that his trial counsel was ineffective for failing to object to Dr. Miceli's testimony.

{¶ 61} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * *. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 62} As discussed in the preceding assignment, Dr. Miceli's testimony was admissible under Evid. R. 702 and was not introduced to impermissibly bolster C.F.'s testimony. Moreover, we note that trial counsel did file a pre-trial motion to exclude Dr. Miceli's testimony on September 19, 2012. Evid. R. 703 and 705 were not violated because Dr. Miceli's testimony was properly limited, and she offered no opinion as to the truth of

C.F.'s assertions. Given the strong presumption that counsel's performance constituted reasonable assistance, Cox's trial counsel was not required to perform a futile act. *State v. Lodge*, 2d Dist. Greene No. 2004CA43, 2005-Ohio-1908. Moreover, Cox has failed to demonstrate that there is a reasonable probability that but for his counsel's failure to object at trial to Dr. Miceli's testimony under Evid. R. 703 and 705, the result of the case would have been any different.

{¶ 63} Cox's sixth assignment of error is overruled.

{¶ 64} Cox's seventh assignment of error is as follows:

{¶ 65} "GRAND JURY TESTIMONY THAT INDICATES RECENT FABRICATION MAY BE USED TO CROSS-EXAMINE A WITNESS."

{¶ 66} In his seventh assignment, Cox asserts that the trial court erred when it refused to allow defense counsel to use C.F.'s grand jury testimony to impeach her during cross-examination with certain sexual acts that she allegedly did not mention at that hearing, specifically the rape and GSI perpetrated by Cox close to her birthday at the house on Rosebury Drive.

{¶ 67} Prior to trial, the court discussed C.F.'s grand jury testimony in order to address defense counsel's concern that Counts II through V of the "A" indictment were not based on evidence that the grand jury had heard. The record establishes that the trial court and both parties listened to C.F.'s grand jury testimony in chambers. After listening to C.F.'s grand jury testimony, defense counsel agreed that C.F. did mention the rape and GSI which occurred on her ninth birthday at the house on Rosebury Drive. Because C.F. did testify regarding the incident during the grand jury proceeding, defense counsel conceded

that it would not be permissible for him to suggest to the jury that she had recently fabricated those allegations of sexual abuse. Accordingly, the trial court did not err when it refused to allow defense counsel to impeach C.F. with her grand jury testimony when she had, in fact, testified before the grand jury regarding the rape and GSI at Rosebury Drive on her ninth birthday.

{¶ 68} Cox's seventh assignment of error is overruled.

{¶ 69} Cox's eighth assignment of error is as follows:

{¶ 70} "THE TRIAL COURT ERRED IN LIMITING THE USE OF EVIDENCE OF THE APPELLANT WITH HERPES AND THE LACK OF SUCH DISEASE IN THE COMPLAINANT."

{¶ 71} In his eighth assignment, Cox contends that the trial court erred when it limited him from introducing evidence regarding the fact that he was infected with herpes and passed it along to women with whom he had sex, but did not give it to C.F.

{¶ 72} Upon review, the record establishes that Cox was permitted to thoroughly explore the topic of his herpes condition during trial. Specifically, defense counsel called Dr. Jodi Van Jura who testified that Cox tested positive for herpes Types 1e and 2 in June of 2012. Defense counsel also elicited testimony from G. that she was positive for herpes Type 2 which she stated that she had contracted prior to 2007. Defense counsel questioned the defendant's current wife, who testified that she, too, tested positive for the herpes virus. Lastly, defense counsel was permitted to elicit testimony from Dr. Lori Vavul-Roediger that C.F. had tested negative for the herpes virus on June 7, 2010. Clearly, the trial court did not prevent defense counsel from making the argument to the jury that Cox must not have

sexually abused C.F. because she wasn't infected with the herpes virus.

{¶ 73} Upon review, we conclude that there is no evidence in the record which establishes that the trial court improperly limited defense counsel's ability to elicit testimony from the witnesses regarding Cox's herpes infection and those he may have or may have not passed it along to through sexual conduct.

{¶ 74} Cox's eighth assignment of error is overruled.

{¶ 75} Cox's ninth assignment of error is as follows:

{¶ 76} "CUMULATIVE ERRORS REQUIRE THE REVERSAL OF THIS CONVICTION."

{¶ 77} In his ninth and final assignment, Cox argues that the he did not receive a fair trial as a result of the effect of cumulative errors which occurred during trial. In addition to the errors he has already assigned and argued, Cox asserts that he was denied a fair trial in light of "various juror problems" and the loss of Ms. Brockert's notes regarding C.F.'s initial disclosure of sexual abuse by Cox.

{¶ 78} **A. Juror Issues**

{¶ 79} Initially, Cox notes that defense counsel took issue with one of the potential jurors "poisoning" the jury pool. Specifically, defense counsel was concerned with potential juror number three, who admitted that she had seen the case covered on the local news. When asked if she had formed any opinions on the case, she stated "Obviously."

{¶ 80} While not a simple "yes" or "no" response, the potential juror's reply did not "poison" the jury. While indicating that she had formed an opinion about the case, her response was ambiguous and certainly was without elaboration. The specifics of what the

potential juror had seen on the news and her personal feelings were discussed at sidebar out of the hearing of the other potential jurors. After the sidebar, the potential juror was excused, and the record is devoid of any evidence that her comment "poisoned" the jury pool.

{¶ 81} Next, Cox argues that he was prejudiced when the trial judge had observed a young lady mouthing words to C.F. from the rear of the courtroom. As a result, the judge cleared the courtroom and questioned the young lady about what she was doing. The young lady stated that she was a friend of C.F.'s and was there for moral support. When the jurors returned to the courtroom, the judge questioned the jury regarding whether they had heard any conversation coming from the rear of the courtroom. A female juror, Number 6, informed the trial court that she had, and the judge questioned her away from the rest of the jurors. Number 6 stated that she had observed a young lady mouthing the words "it's okay" or "be strong" to the victim, C.F. Number 6 further stated that what she had observed would not affect her ability to be impartial nor would she consider it for any reason while deliberating. Neither party objected to Number 6 remaining on the jury, and the judge banned C.F.'s friend from the courtroom for the remainder of the trial.

{¶ 82} The last juror issue occurred when the same juror, Number 6 , went out to dinner during the trial and was accidentally exposed to information about the case. The next day, Number 6 informed the bailiff, and the judge questioned her in chambers. Number 6 informed the judge that what she heard prevented her from being fair and impartial. Number 6 stated that she had not talked to any of the other jurors regarding what she heard about the case. The trial court excused her, and neither party objected.

**{¶ 83}** Other than pointing out the "juror issues" that occurred at trial, Cox fails to establish that any resulting prejudice occurred. Moreover, in cases involving outside influences on jurors, trial courts are granted broad discretion in assessing the impact and determining the appropriate remedy. *State v. Williams*, 2d Dist. Montgomery No. 22126, 2008-Ohio-2069, citing *State v. Phillips,* 74 Ohio St.3d 72, 656 N.E.2d 643 (1995). In all three incidents, the trial court acted discreetly and decisively, questioning each juror outside of the presence of the others, and excusing the seated juror when she could not remain impartial. In this manner, the trial court attempted to insure that the remaining jurors listened to only the evidence presented during the trial and were not affected by outside influences. Accordingly, there is no basis to find that these incidents affected Cox's right to a fair trial or that he suffered prejudice as a result.

**{¶ 84}  B. Loss of Brockert's Handwritten Notes**

**{¶ 85}** Cox asserts that he was prejudiced by the State's loss of Brockert's handwritten notes pertaining to C.F.'s initial disclosure of sexual abuse. Cox filed a motion to dismiss based on the lost evidence. The trial court held a hearing on Cox's motion on October 4, 2012, prior to trial. Brockert, Officer Nicholas Bell, and Detective William Ring testified at the hearing.

**{¶ 86}** Brockert testified that she took handwritten notes when she initially spoke with C.F. about the sexual abuse she had suffered. Brockert stated that she used the notes during her meeting with Officer Bell in order to refresh her memory regarding the details of what C.F. had told her. Brockert testified that there was nothing exculpatory or anything that would exonerate Cox in her notes. After speaking with Officer Bell, Brockert testified

that she drafted a written statement taken directly from her handwritten notes. Brockert testified that she did not include any information in her written statement that was not in her notes. Brockert gave the notes to Detective Mitchell, and kept a copy for herself. Brockert, however, lost her copy of the notes before trial, and the Miamisburg Police Department was also unable to locate the originals in the case file, records, or the property room.

{¶ 87} The state's failure to preserve materially exculpatory evidence violates a defendant's due process rights under the Fourteenth Amendment to the United States Constitution. The burden rests with the defendant to prove that the evidence in question was materially exculpatory. Such evidence is deemed materially exculpatory if "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *State v. Grigley*, 2d Dist. Montgomery No. 21632, 2007-Ohio-3159, citing *State v. Durnwald*, 163 Ohio App.3d 361, 2005-Ohio-4867, 837 N.E.2d 1234 (6th Dist.).

{¶ 88} In contrast, evidence is not materially exculpatory if it is merely potentially useful. Potentially useful evidence indicates that the evidence may or may not have incriminated the defendant. The failure to preserve evidence that by its nature or subject is merely potentially useful violates a defendant's due process rights only if the police or prosecution acted in bad faith. The term "bad faith" generally implies something more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the

nature of fraud. *Id.*

**{¶ 89}** Our standard of review on the ruling regarding the lost notes is an abuse of discretion. An "[a]buse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248, 1252 (1985). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 167, 553 N.E.2d 597 (1990).

**{¶ 90}** Upon review, we conclude that the trial court did not abuse its discretion when it overruled Cox's motion to dismiss based on the failure of the State to produce Brockert's handwritten notes outlining C.F.'s initial narrative about her sexual abuse. In fact, the record establishes that the notes were simply misplaced. Brockert testified that there was nothing in the notes that was exculpatory or exonerated Cox. The record establishes that Cox failed to demonstrate that the notes were anything more than *potentially* useful. Significantly, Cox also failed to establish that the State lost the notes as a result of bad faith. Absent bad faith, the trial court properly found that no due process violation occurred and hence correctly overruled Cox's motion to dismiss.

**{¶ 91}** Finally, turning to Cox's cumulative error argument, "separately harmless

errors may violate a defendant's right to a fair trial when the errors are considered together. *State v. Madrigal*, 87 Ohio St.3d 378, 2000-Ohio-448, 721 N.E.2d 52. In order to find 'cumulative error' present, we must first find that multiple errors were committed at trial. *Id*. at 398, 721 N.E.2d 52. We must then find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Thomas*, Clark App. No. 2000-CA-43, 2001-Ohio-1353." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 33. "Where no individual, prejudicial error has been shown, there can be no cumulative error. *State v. Blankenship* (1995), 102 Ohio App.3d 534, 557, 657 N.E.2d 559." *State v. Jones*, 2d Dist. Montgomery No. 20349, 2005-Ohio-1208, ¶ 66.

{¶ 92} In light of our foregoing analysis, we find that Cox has failed to establish that any errors occurred in the instant case. *State v. Moreland*, 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905 (1990). Thus, we fail to see how the absence of error can constitute cumulative error. *Id*.

{¶ 93} Cox's ninth and final assignment of error is overruled.

{¶ 94} All of Cox's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

Kirsten A. Brandt
George A. Katchmer
Hon. Michael L. Tucker