[Cite as *State v. Zimpfer*, 2014-Ohio-4401.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee            :            C.A. CASE NO.    26062

v.                                     :            T.C. NO.    12-CR-3315

THOMAS S. ZIMPFER                      :            (Criminal appeal from
                                       Common Pleas Court)

    Defendant-Appellant           :

                                                  :

               . . . . . . . . . .

**O P I N I O N**

Rendered on the _____3rd_____ day of _____October_____, 2014.

. . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

GEORGE A. KATCHMER, Atty. Reg. #0005031, 1886 Brock Road NE, Bloomingburg, Ohio 43106
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   Defendant-appellant Thomas Scott Zimpfer appeals his conviction and

sentence for three counts of unlawful sexual conduct with a minor, in violation of 2907.04(A), all felonies of the third degree, and four counts of rape (by force or threat of force), in violation of 2907.02(A)(2), all felonies of the first degree. Zimpfer filed a timely notice of appeal with this Court on January 22, 2014.

{¶ 2} The events which form the basis for the instant appeal occurred between the dates of November 18, 2004, and November 18, 2009. On November 23, 2003, Zimpfer, his wife Ericka, and their two children moved into a residence located in the Dayton area. Shortly thereafter, Zimpfer and his family met and befriended their neighbors. The Zimpfers also befriended their neighbors' twelve-year old daughter, L.R. In particular, L.R. and Ericka became very close.[1] In exchange for horse riding lessons, L.R. would help Ericka with her horses and babysit the Zimpfers' youngest child, K.Z.

{¶ 3} Once she turned thirteen years old, L.R. began spending a significant amount of time at the Zimpfers' residence. During the school year, L.R. would go to the Zimpfer residence after school let out and stay until mid-evening, oftentimes babysitting K.Z. until Ericka or Zimpfer got home from their respective jobs. While she was on summer vacation, L.R. testified that she "was there pretty much all day every day." Tr. 236, Ln. 20-21. The Zimpfers took L.R. shopping, out to eat, and on vacation. L.R. referred to the Zimpfers as her "second family." Tr. 241, Ln. 1.

{¶ 4} In fact, L.R. referred to Zimpfer as her "second dad." Tr. 241, Ln. 25. Zimpfer likened L.R. to an "adopted daughter." Tr. 462, Ln. 5-6. Zimpfer helped L.R. with her school homework, and she confided in him regarding issues she was having with her

---

[1]At the time of trial, L.R. was twenty-one years old.

parents and boyfriends. L.R. testified that during school breaks when she was babysitting K.Z., Zimpfer would come home from work between 10:30 a.m. and 1:00 p.m. while K.Z. was napping.

**{¶ 5}**    **A. The First Incident**

**{¶ 6}**    L.R. testified that the first rape occurred when she was thirteen years old. L.R. was on break from school, and she was babysitting K.Z. at the Zimpfer residence. Zimpfer came home during lunchtime and asked L.R. how she was feeling. L.R. explained to Zimpfer that she was upset because she had just broken up with her boyfriend. L.R. testified that Zimpfer was initially very understanding and empathetic. However, at some point in the conversation, Zimpfer started asking L.R. questions that were sexual in nature. Specifically, Zimpfer asked L.R. what sexual acts she and her ex-boyfriend had engaged in together. L.R. told Zimpfer that she and her ex-boyfriend had not engaged in any sexual acts.

**{¶ 7}**    At this point, Zimpfer went to the kitchen and brought back a cup containing some sort of alcohol and gave it to L.R. who took a few drinks from the cup. Zimpfer began rubbing L.R.'s inner thigh and eventually moved to her vaginal area over her clothes. Zimpfer unbuttoned her pants and began to rub her vaginal area over her underwear. L.R. testified that she was confused by Zimpfer's behavior, and she began to feel sick. L.R. told Zimpfer she was not feeling well, and he brought her into a bathroom in the downstairs section of the house.

**{¶ 8}**    While L.R. stood in front of the sink in the bathroom, Zimpfer pulled up her shirt and began rubbing her breasts. Zimpfer then placed his hand inside of L.R.'s

underwear and penetrated her vagina with his fingers. L.R. testified that she felt like she was in shock. L.R. told Zimpfer that she was sick and wanted to go home. Zimpfer drove her home. L.R. did not tell anyone about the sexual assault.

**{¶ 9}   B. The Second Incident**

**{¶ 10}**   Despite being sexually assaulted, L.R. returned to the Zimpfer residence in order to babysit K.Z. In the spring or summer of 2005, while she was still thirteen years old, L.R. was watching K.Z. while Ericka and Zimpfer were at work. Once again, Zimpfer came home while K.Z. was taking a nap. Zimpfer grabbed L.R. by the wrist and pulled her into his bedroom. L.R. testified that she did not try to resist Zimpfer's advances because she believed it would only make things worse. Zimpfer began kissing L.R. on the neck and ears and rubbing her breasts and vaginal area over her clothes. Zimpfer then removed L.R.'s pants and penetrated her vagina with his fingers. Zimpfer placed L.R. on the bed and retrieved a purple sex toy from his dresser. Zimpfer walked back to the bed and penetrated L.R. vaginally with the sex toy. After he was done, Zimpfer left the house and ostensibly went back to work.

**{¶ 11}   C. The Third Incident**

**{¶ 12}**   Shortly after the incident involving the sex toy, L.R. was back at the Zimpfer residence babysitting K.Z. Zimpfer returned home while K.Z. was napping, grabbed L.R. by the wrist, and led her upstairs to his bedroom. L.R. testified that she did not resist because "[Zimpfer] was bigger than [her and] he was always going to overpower [her]." Zimpfer tried to kiss L.R., and then he began rubbing her breasts and vaginal area over her clothes. Zimpfer removed L.R.'s pants and penetrated her digitally. L.R. testified that

after penetrating her with his fingers, Zimpfer placed her on the bed, removed his pants, got on top of her, and penetrated her with his penis. After he was done, Zimpfer left the residence.

{¶ 13} After Zimpfer began sexually abusing L.R., she started dressing in all black clothes. L.R. also dyed her hair black, painted her fingernails black, and wore black eye makeup. Additionally, L.R. began cutting herself. L.R. testified that Zimpfer was aware of the cutting and would threaten to tell her parents as a means of forcing her to keep the abuse a secret.

{¶ 14} **D. The Fourth Incident**

{¶ 15} The next incident occurred when L.R. was fifteen years old. Zimpfer came home while K.Z. was taking a nap. L.R. testified that Zimpfer took her by the wrist and tried to pull her upstairs to his bedroom. "[T]ired of being used and mistreated[,]" L.R. told Zimpfer that she did not want to go upstairs, and attempted to pull away from him. Tr. 260, Ln. 2-15. When she wrenched her arm away from Zimpfer, however, she hit her head on the wall and became disoriented. L.R. testified that her attempt to resist made Zimpfer very angry. Zimpfer immediately took L.R. into his bedroom, took off her pants, removed his pants, and penetrated her vagina with his penis on the bed. When Zimpfer was done, he got up, put his pants back on, slammed the bedroom door behind him, and left the house.

{¶ 16} By this point, L.R. had only told one of her female friends and her boyfriend, D.P., about the sexual abuse, but she made them keep it secret. L.R. had been dating D.P. since she was fourteen. D.P. attempted to get L.R. to tell the police about the sexual abuse, but she was afraid to do so because Zimpfer had threatened her and her family.

**{¶ 17}   E. The Fifth Incident**

**{¶ 18}**   The final incident occurred when L.R. was sixteen.   L.R. testified that at this juncture, she was getting along better with her family and had been going to the Zimpfer residence very sporadically.   However, one day Ericka sent a text message to L.R.'s father asking if L.R. could come to the residence and weed the flowerbeds.   L.R.'s father sent her to the Zimpfers at Ericka's request.

**{¶ 19}**   D.P. asked her not to go to the Zimpfer residence that day, but L.R. testified that she believed if she refused, she would arouse suspicion.   L.R. drove her car over to the Zimpfer residence and parked very close to the flowerbeds.   L.R. testified that she did not observe any of the vehicles that Zimpfer drove.   Accordingly, L.R. assumed no one was home and she would be safe.   Zimpfer, however, emerged from the house while L.R. was weeding, grabbed her by the arm, and pulled her into the house.   L.R. attempted to fight him off, but Zimpfer overpowered her.   He removed her pants, pushed her up against the sectional sofa in the living room, and penetrated her vagina with his penis.   Thereafter, L.R. pulled her pants up, ran outside the house, and retrieved her phone.   L.R. sent a text to D.P. in which she asked him to come and help her.   Zimpfer remained in the house.

**{¶ 20}**   Upon arriving at the Zimpfer residence, D.P. located L.R. near the flowerbeds.   D.P. testified that L.R. seemed very upset and was acting uncharacteristically emotional.   At this point, D.P. went to house and beat on the front door.   Zimpfer did not come to the door, nor did he come outside while L.R. and D.P. were still there.   L.R. finished the weeding because she did not want Ericka to be suspicious regarding why the job was not done.   L.R. and D.P. eventually left and went back to her house.

{¶ 21} L.R. disclosed Zimpfer's sexual abuse to the police in August of 2012. On February 1, 2013, Zimpfer was indicted for one count of unlawful sexual conduct with a minor and one count of rape. On August 1, 2013, in "Reindictment B," Zimpfer was charged with four additional counts of rape, each of which were accompanied by a sexually violent predator specification. On August 26, 2013, in "Reindictment C," Zimpfer was charged with two additional counts of unlawful sexual conduct with a minor. The State later nolled the single rape count charged in the "Direct" indictment filed on February 1, 2013.

{¶ 22} After the State filed its witness list, Zimpfer objected to the prosecution calling Dr. Brenda J. Miceli and moved the trial court to exclude her testimony. The trial court scheduled a *Daubert* hearing on October 20, 2013, in order to determine the admissibility of Dr. Miceli's testimony. In an order issued on September 24, 2013, the trial court overruled Zimpfer's objection, vacated the scheduled *Daubert* hearing, and set forth parameters for the admissibility of Dr. Miceli's testimony.

{¶ 23} On October 16, 2013, Zimpfer filed a waiver of jury trial only with respect to the sexually violent predator specifications. After a jury trial which began on October 22, 2013, and ended on October 24, 2013, Zimpfer was found guilty of four counts of rape (by force or threat of force) and three counts of unlawful sexual conduct with a minor. The court held a bench trial on January 9, 2014, regarding the four sexually violent predator specifications. In a judgment entry issued on January 16, 2014, the trial court found Zimpfer not guilty of all of the specifications.

{¶ 24} On January 17, 2014, the trial court sentenced Zimpfer to an aggregate prison term of thirty-three years. Zimpfer was also designated as a Tier III sex

offender/child victim offender.

**{¶ 25}** It is from this judgment that Zimpfer now appeals.

**{¶ 26}** Zimpfer's first assignment of error is as follows:

**{¶ 27}** "AN EXPERT WITNESS MUST DERIVE HER OPINION FROM FACTS OR DATA OF THE PARTICULAR CASE UPON WHICH THE EXPERT BASES AN OPINION OR INFERENCE OTHERWISE SUCH TESTIMONY VIOLATES EVID. R. 403."

**{¶ 28}** In his first assignment, Zimpfer contends that the trial court erred by admitting the expert testimony of Dr. Brenda J. Miceli, a clinical child psychologist, who testified at trial regarding the behavioral characteristics of children who have been sexually abused. Specifically, Zimpfer argues that Dr. Miceli's testimony was not admissible under either Evid. R. 703 or 705, and was only presented by the State to bolster L.R.'s credibility with the jury.

**{¶ 29}** Initially, we note that Zimpfer's counsel objected to the admission of Dr. Miceli's testimony on the basis that it was not qualified under Evid. R. 702(B) and the test enunciated by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). On appeal, however, Zimpfer's brief asserts a new argument for excluding Dr. Miceli's testimony, one that was not raised before the trial court. Accordingly, Zimpfer has waived all but plain error in regards to the admission of Dr. Miceli's testimony. An appellate court has the discretion to notice plain error under Crim. R. 52(B) "with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372

N.E2d 804 (1978), ¶ 3 of the syllabus. Plain error does not exist unless, but for the error, the outcome of the proceedings would have been different. *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990).

{¶ 30}    "[T]he Ohio Supreme Court has found that testimony from a psychologist on the behavioral characteristics of sexually abused children is admissible, see *State v. Stowers* (1998), 81 Ohio St.3d 260, 262, 690 N.E.2d 881, and so have we. [*State v.Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280 (2d Dist.)]." *State v. Rosas,* 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 41.    "What an expert may not do is offer a direct opinion on whether a child is telling the truth. *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220." *Id.*, ¶ 42.    We review the admission of expert testimony under an abuse of discretion standard of review. *See Bell*.  In *Bell,* Dr. Miceli was retained by the State "to testify regarding the wide range of behaviors that sexually abused children may exhibit, including internalizing behaviors, externalizing behaviors, and sexualized behaviors."  Dr. Miceli did not opine on whether the victims were sexually abused by the defendant, and this Court concluded that the trial court did not abuse its discretion in admitting the testimony as follows:

> Dr. Miceli simply offered her opinions regarding the wide range of behavioral characteristics displayed by minor victims of sexual abuse.  The law clearly permits this kind of expert testimony, and Dr. Miceli did not go beyond permissible boundaries and opine whether these children were in fact abused by Bell.  A thorough review of Dr. Miceli's expert testimony establishes that she possessed specialized knowledge that could aid a trier of

fact in assessing whether the children actually suffered sexual abuse.

*Bell*, ¶ 57.

{¶ 31} In support of his argument that Dr. Miceli's testimony was inadmissible, Zimpfer cites to former Justice Alice Robie Resnick's dissent in *Stowers* wherein she asserted that an expert witness' testimony regarding whether the behavior of an alleged victim of child abuse is consistent with the behavior observed in sexually abused children "should be inadmissible until it is scientifically established that there are proven and accepted behavioral characteristics of a standard child-sexual-abuse victim." *Id*. at 264.

{¶ 32} The difficulty with this argument is that represents a minority position and is not the law in the State of Ohio. In the instant case, Dr. Miceli permissbly testified regarding some of the behaviors that sexually abused children may exhibit, including the tendency to delay the reporting of sexual abuse, as was the case here. Dr. Miceli also offered testimony regarding the tendency of children who have been sexually abused to only provide partial reports of the alleged abuse which is permissible under *Stowers* and its progeny.

{¶ 33} Similar to the defendant in *State v. Cox,* 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 53, Zimpfer argues that Dr. Miceli failed to disclose the facts and data used as a basis for her opinion, as required by Evidence Rule 705. Dr. Miceli, however, did not offer an opinion as to whether L.R. had, in fact, been abused. Instead, Dr. Miceli's testimony was correctly limited by the trial court to a specialized overview of particular behavioral characteristics of sexually abused children in order to give the jurors a better understanding of those characteristics. Accordingly, Dr. Miceli's testimony regarding the

behavioral characteristics displayed by minor victims of sexual abuse was admissible to aid the jury in assessing whether L.R. actually suffered sexual abuse at the hands of Zimpfer. See *State v. Weber*, 2d Dist. Montgomery No. 25508, 2013-Ohio-3172.

**{¶ 34}** Further, we note that in the judgment entry overruling Zimpfer's objection to Dr. Miceli's testimony, vacating the *Daubert* hearing, and setting forth the parameters for the admissibility of her expert testimony, the trial court ordered the State to provide a written report to defense counsel pursuant to Crim. R. 16(K) *only* if it intended to question Dr. Miceli regarding the particular facts of the instant case. As previously stated, Dr. Miceli did not offer any testimony about L.R.'s conduct in particular. Dr. Miceli simply testified regarding the common behavioral characteristics of children who have been sexually abused. Significantly, during Dr. Miceli's cross-examination, defense counsel acknowledged that the State provided him with a "summary of information" on which the expert based a portion of her testimony concerning the general characteristics of the sexually abused children.

**{¶ 35}** With respect to Dr. Miceli's extensive credentials, we stated the following in *Cox*:

> There is little doubt that Dr. Micelli possesses extensive formal education and broad, deep experience with sexually abused children. Her testimony here establishes this, and we have previously so found. See *State v. Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578 (recognizing Dr. Micelli's extensive experience with sexually abused children). After examining the record, we find nothing that would call into question the reliability of her testimony. Her testimony on the behavioral characteristics of

sexually-abused children has a reliable basis in the knowledge and experience of the field of psychology, which she has acquired from the classroom and the clinic.

*Id*. at ¶ 54.

{¶ 36} Zimpfer also asserts that the State called Dr. Miceli to testify solely to bolster L.R.'s testimony. As we previously found in *Cox*, there is a distinction "between expert testimony that a child witness is telling the truth," on the one hand, and on the other hand, "evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused." *Id*. at ¶ 55, citing *Stowers*, at 262. Expert testimony is admissible as to the latter. This is evidence that provides "additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." *Id.* (emphasis added in original). Such testimony "does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination." *Id*. Here, as in *Cox*, Dr. Miceli's testimony is within permissible bounds. She testified about the behavioral characteristics of sexually abused children in an effort to educate the jury regarding delayed and partial reporting of sexual abuse by children. Thus, the trial court did not err, plainly or otherwise, when it admitted the testimony of Dr. Miceli.

{¶ 37} Zimpfer's first assignment of error is overruled.

{¶ 38} Because they are interrelated, Zimpfer's second and fourth assignments of error are as follows:

{¶ 39} "THE STATE PRESENTED INSUFFICIENT EVIDENCE OF FORCE BY

AN AUTHORITY FIGURE TO SUSTAIN CONVICTIONS FOR RAPE BY FORCE OR THREAT OF FORCE."

{¶ 40} "THE JURY ERRED IN CONVICTING THE APPELLANT OF RAPE BY FORCE BY AN AUTHORITY FIGURE AND MUST BE REVERSED BECAUSE THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 41} In his second assignment, Zimpfer argues that insufficient evidence was adduced at trial to sustain his convictions for rape by force or threat of force. In his fourth assignment, Zimpfer contends that his convictions for rape by force or threat of force are against the manifest weight of the evidence.

{¶ 42} Initially, we note that Zimpfer preserved his insufficiency argument by making an unsuccessful Crim. R. 29 motion for acquittal at the close of evidence at trial. Crim. R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense. "Reviewing the denial of a Crim. R. 29 motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim." *State v. Witcher*, 6th Dist. Lucas No. L-06-1039, 2007-Ohio-3960. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley*, 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

{¶ 43} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101,112,

2005-Ohio-6046, 837 N.E.2d 315. "A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 44} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶ 45} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 46} Zimpfer was convicted of four counts rape in violation of R.C. 2907.02(A)(2), in that he engaged in sexual conduct with another, purposely compelling the

other person to submit by force or threat of force. The force element is defined as follows: " ' Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Force or the threat of force "can be inferred from the circumstances surrounding sexual conduct." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), at ¶ 1 of the syllabus. In order to make a finding of force under R.C. 2907.02, "some amount of force must be proven beyond that force inherent in the crime itself." *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N.E.2d 763 (1998). In *State v. Eskridge*, 38 Ohio St. 3d 56, 526 N.E.2d 304 (1988), the Ohio Supreme Court held that the force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. "As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id*. Therefore, the context of the rape will also affect our inferences regarding the additional element of force or threats of force.

{¶ 47} Upon review, the record establishes that Zimpfer assumed a role of parental authority over L.R. In fact, L.R. viewed Zimpfer as her "second dad." Zimpfer testified that he thought of L.R. as his "adopted daughter." Zimpfer further stated that he wanted "the same stuff for [L.R.] that [he] wanted for [his] kids." With the filial obligation of obedience to a parent, the same degree of force and violence is not required upon a person of tender years as would be required were the parties more equal in age, size and strength. *Eskridge*, at 58. In situations involving the sexual assault of a child by a parent, the force used need not be overt and physically brutal, but can be subtle and psychological. As long as it is shown that the rape victim's will was overcome by fear or duress, the force element

of rape is established. *Id.* The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose. *Id.* This same reasoning also applies with equal force when a child is sexually abused by a non-parent who is in a position of authority, such as a stepfather or babysitter. *State v. Marrs*, 2d Dist. Montgomery No. 18903, 2002-Ohio-3300.

**{¶ 48}** L.R. testified that all of the rapes occurred at the Zimpfer residence. L.R. also testified that Zimpfer ordered her not to tell anyone about the abuse. Zimpfer threatened L.R. and her family. Zimpfer also threatened to tell her parents about her cutting herself. L.R. believed Zimpfer would act upon his threats. Furthermore, there were times during the sexual abuse when L.R. told Zimpfer to stop or tried to push him away to no avail. Zimpfer simply ignored L.R. and continued the sexual abuse. L.R. testified that she felt powerless against Zimpfer, that he was going to do what he wanted to do and there was nothing she could do about it. We note that Zimpfer was approximately six feet tall and weighed two-hundred and forty pounds. L.R. was only thirteen, fifteen, and sixteen years old when the rapes occurred. Zimpfer was significantly bigger and stronger than L.R. Zimpfer overpowered L.R. by pulling her into the rooms where the rapes occurred, removing her clothing, and physically positioning his body against/over hers.

**{¶ 49}** Construing the evidence presented in a light most favorable to the State, as we must, we conclude that a rational trier of fact could find all of the essential elements of the crimes of rape to have been proven beyond a reasonable doubt, including that Zimpfer compelled L.R. to submit by force or threat of force. Zimpfer's rape convictions are

therefore supported by legally sufficient evidence.

{¶ 50} Finally, ZImpfer's convictions are not against the manifest weight of the evidence. The credibility of the witnesses and the weight to be given their testimony were matters for the jury to resolve. The jury did not lose its way simply because it chose to believe the testimony of the victim, L.R., who testified at length regarding Zimpfer forcing her to submit to multiple instances of digital and penile rape, as well as the offense wherein he inserted a sex toy into her vagina. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice has occurred.

{¶ 51} Zimpfer's second and fourth assignments of error are overruled.

{¶ 52} Zimpfer's third assignment of error is as follows:

{¶ 53} "BECAUSE THE STATE PRESENTED INSUFFICIENT EVIDENCE OF FORCE BY AN AUTHORITY FIGURE TO SUSTAIN CONVICTIONS FOR RAPE BY FORCE OR THREAT OF FORCE THE COURT ERRED IN GIVING AN INSTRUCTION CONCERNING THE STATUS AS AN AUTHORITY FIGURE AND THE INSTRUCTION GIVEN BY THE COURT WAS CONFUSING TO THE JURY."

{¶ 54} First, it is uncontroverted that Zimpfer occupied the status of authority figure in relation to L.R. In light of our disposition with respect to Zimpfer's second assignment of error on sufficiency of the evidence, with regard to force and the evidence of Zimpfer's status as an authority figure, the third assignment of error is overruled.

{¶ 55} Zimpfer's fifth assignment of error is as follows:

{¶ 56} "THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE

INEFFECTIVENESS OF COUNSEL."

{¶ 57}   In his fifth assignment, Zimpfer contends that he received ineffective assistance of counsel at trial.   Specifically, Zimpfer argues that counsel was deficient for failing to object to the admission of Dr. Miceli's testimony pursuant to Evidence Rules 702, 703, 705, and 403.   Zimpfer argues that his counsel was also ineffective for failing to object to the jury instruction the trial court gave pertaining to his status as an authority figure.

{¶ 58}   "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * *.   Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688.   To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.*   Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 59}   As discussed in the first assignment, Dr. Miceli's testimony was admissible under Evid. R. 702 and was not introduced to impermissibly bolster L.R.'s testimony.

Moreover, we note that trial counsel did file a pre-trial motion to exclude Dr. Miceli's testimony on September 19, 2012. Evid. R. 703 and 705 were not violated because Dr. Miceli's testimony was properly limited, and she offered no opinion as to the truth of L.R.'s assertions. See *State v. Cox*, 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 62. Given the strong presumption that counsel's performance constituted reasonable assistance, Zimpfer's trial counsel was not required to perform a futile act. *State v. Lodge*, 2d Dist. Greene No. 2004CA43, 2005-Ohio-1908. Moreover, Zimpfer has failed to demonstrate that there is a reasonable probability that but for his counsel's failure to object at trial to Dr. Miceli's testimony under Evid. R. 703, 705, and 403, the result of the case would have been any different.

{¶ 60} At the conclusion of Zimpfer's second assignment of error, we found that there was sufficient evidence adduced during trial to sustain his convictions for rape by force or threat of force. Moreover, we specifically found that the evidence established that Zimpfer assumed a role of parental authority over L.R. Accordingly, trial counsel's failure to object to the court's instruction regarding his status as an authority figure to L.R. does not amount to ineffective assistance.

{¶ 61} Zimpfer's fifth assignment of error is overruled.

{¶ 62} Zimpfer's sixth and final assignment of error is as follows:

{¶ 63} "CUMULATIVE ERRORS DEPRIVED THE APPELLANT OF A FAIR TRIAL."

{¶ 64} "[S]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. *State v. Madrigal*, 87 Ohio St.3d 378,

2000-Ohio-448, 721 N.E.2d 52.   In order to find 'cumulative error' present, we must first find that multiple errors were committed at trial. *Id*. at 398, 721 N.E.2d 52.   We must then find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Thomas*, Clark App. No. 2000-CA-43, 2001-Ohio-1353." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 33.   "Where no individual, prejudicial error has been shown, there can be no cumulative error. *State v. Blankenship* (1995), 102 Ohio App.3d 534, 557, 657 N.E.2d 559." *State v. Jones*, 2d Dist. Montgomery No. 20349, 2005-Ohio-1208, ¶ 66.

{¶ 65}   In light of our foregoing analysis, we find that Zimpfer has failed to establish that any errors occurred in the instant case. *State v. Moreland*, 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905 (1990).   Thus, we fail to see how the absence of error can constitute cumulative error. *Id*.

{¶ 66}   Zimpfer's sixth and final assignment of error is overruled.

{¶ 67}   All of Zimpfer's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J., and WELBAUM, J., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
George A. Katchmer
Hon. Steven K. Dankof