[Cite as *State v. Artz*, 2015-Ohio-5291.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26411 |
| | : | |
| v. | : | Trial Court Case No. 2013-CR-1786 |
| | : | |
| GREG M. ARTZ | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of December, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

GEORGE A. KATCHMER, Atty. Reg. No. 0005031, 1886 Brock Road N.E., Bloomingburg, Ohio 43106
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Greg M. Artz, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of multiple counts of rape and gross sexual imposition of his two minor daughters. For the reasons outlined below, the judgment of the trial court will be affirmed.

## Facts and Course of Proceedings

{¶ 2} On November 21, 2013, the Montgomery County Grand Jury returned an indictment charging Artz with 26 counts of rape of a minor under the age of 13 in violation of R.C. 2907.02(A)(1)(b), with the first 18 counts including a specification that the victim was under the age of 10. Artz was also charged with two counts of gross sexual imposition of a minor under the age of 13 in violation of R.C. 2907.05(A)(4) and one count of sexual imposition in violation of R.C. 2907.06(A)(4). The charges stemmed from allegations that Artz had sexually abused his two minor daughters, A. and L. Artz pled not guilty to the charges and the matter proceeded to a jury trial beginning on August 26, 2014. At the time of trial, A. was 17-years-old and L. was seven-years-old.

{¶ 3} It is undisputed that A.'s mother, R., divorced Artz in 2001 and agreed to an equal visitation schedule in which A. and her older brother would spend half of each week with Artz. It is also undisputed that while A. was growing up, Artz resided at five different addresses described as the W. residence, B***w residence, H. residence, N. residence, and B***h residence. Artz's second wife, D., resided with Artz at the W., B***w, H., and

N. residences prior to their divorce in 2010. Artz and D. have three children together, one of which is L.

*Artz's Sexual Abuse of A.*

{¶ 4} At trial, A. testified that for as long as she could remember, on most nights she stayed with Artz, Artz would enter her bedroom in the middle of the night, order her to sit on the bed, put his penis in her mouth, and make her perform oral sex on him. According to A., if she was sleeping, Artz would wake her up by simply removing her blanket, or by telling her to either "wake up," "sit up" or "stand up." Trial Trans. Vol. II (Aug. 27, 2014), p. 234. A. also testified that there were times when she was already awake when Artz entered her bedroom. Additionally, during her recorded forensic interview that was played for the jury, A. recalled that when staying at the N. residence, Artz was unable to shut her bedroom door all the way after he entered her room due to the condition of the carpet.

{¶ 5} A. also testified that after Artz made her perform oral sex on him, he would then have her stand up, turn her around, pull down her pants, and bend her over the bed. According to A., Artz would then proceed with intercourse; however, she did not know whether Artz's penis entered her vagina or anus, noting only that it was painful. A. further explained during her forensic interview that once Artz bent her over the bed she would "zone out" and that she assumed he was entering her, but did not specifically remember what happened. A. further testified that when Artz finished he would pull up her pants and leave the room without saying anything.

{¶ 6} Both at trial and during her forensic interview, A. claimed the sexual abuse

happened the exact same way each night that the abuse occurred. A. testified that this "routine" happened countless times until she started her period at age 13 in January 2010. Although she could not remember exactly when the abuse began, A. estimated it was sometime between three or four years old. A. further estimated that the abuse happened more than 10 times at the B***w residence where Artz lived when she was in kindergarten, more than 20 times at the H. residence where Artz lived when she was in the first and second grades, and more than 25 times at the N. residence when she was in the third through seventh grades.

{¶ 7} As it relates to these three residences, A. claimed that she had her own bedroom and specifically remembered the sexual abuse occurring in each of the bedrooms. A. also recalled two or three occasions when Artz would take her into his own bedroom at the N. residence and perform the same abusive routine there. According to A., this only occurred after Artz's second wife, D., moved out of the home around the time she was in the sixth grade. D. also testified at trial and confirmed that she moved out of the N. residence in 2009, a portion of which A. was in the sixth grade. D. further testified that she was a heavy sleeper, but on occasion would notice Artz getting up in the middle of the night. When D. would question Artz about this, Artz told her he was letting the dog out.

{¶ 8} A. also testified that she first disclosed the abuse to a friend in the fourth grade. According to A., it was not until this disclosure that she realized what Artz was doing was wrong. A. also testified that she told another friend, S.T., about the abuse in the seventh grade. S.T. testified at trial and confirmed A.'s disclosure, noting that A. was afraid to tell anyone else about the abuse.

**{¶ 9}** A. further testified that she discovered blood in her underwear while at school in the fourth grade. As a result, A. went to the school nurse, who called her mother. A. claimed her mother thereafter took her to the doctor, but no follow-up treatment was provided. A.'s mother, R., testified at trial and confirmed that the school nurse had called her regarding A. when A. was in the fourth grade. R. acknowledged that she took A. to the doctor after being concerned that A. may have started her period.

**{¶ 10}** Continuing, A. testified that she wrote about the sexual abuse in her journal, which her stepfather confronted her about after he accidentally read a specific entry in the journal. A.'s entire journal, as well as a copy of the specific entry discovered by A.'s stepfather, were admitted into evidence. The specific entry discovered by A.'s stepfather contained lyrics written by A. describing how she will never forget the rape and abuse and how it has affected her. A. testified that when she was confronted by her stepfather, she admitted that Artz had sexually abused her and thereafter reported the abuse to police. A.'s stepfather also testified at trial and confirmed that A. had disclosed Artz as her abuser when he confronted her about the passage in her journal.

*Artz's Sexual Abuse of L.*

**{¶ 11}** After A. reported the abuse to police, the authorities interviewed L., A.'s seven-year-old half-sister, who claimed that Artz had touched her inappropriately. At trial, L. testified that on more than one occasion Artz touched and/or rubbed her vagina and buttocks with his hand over her clothes. L. also testified that Artz tried to make her touch his penis. L. claimed that Artz would pull her arm toward his penis even though she would kick and push him away with her feet and hands. L. testified that she was

able to push Artz away and that she never actually touched his penis, but claimed she saw his penis while they were in the shower bathing together.

{¶ 12} According to L., the inappropriate touching happened seven times at Artz's parent's residence on B***h Road.   L. also testified that the sexual abuse happened three times in hotels when Artz took her on out-of-state trips for his job as a package delivery driver.   At trial, D. confirmed that Artz went out of town for his job and took L. with him on more than ten occasions.   D. also testified that L.'s vagina would be red and swollen when she came back from trips with Artz.

*Expert Testimony*

{¶ 13} In addition to A. and L.'s testimony, the State presented expert testimony from Dr. Brenda Joyce Miceli, a clinical child psychologist.   Dr. Miceli testified regarding behavioral characteristics of sexually abused children, such as delaying disclosures and continuing to spend time with their abusers.   Dr. Miceli also provided insight as to why abusers will cease the abuse.   She explained that the abuse will oftentimes stop when the child victim reaches puberty due to the abuser having no further attraction to the child or due to the chance of pregnancy.   Dr. Miceli testified that she had not previously communicated with either A. or L., nor reviewed any of the case materials.   This prompted the defense to object to her qualification as an expert witness, which the trial court overruled.

{¶ 14} The State also provided expert testimony from Dr. Lori Vavul-Roediger, a child abuse pediatrics specialist.   Dr. Vavul-Roediger testified regarding her physical examination of L. and how the exam neither confirmed nor denied the alleged abuse.

Dr. Vavul-Roediger further opined that a female child may misperceive penetration, because if an object is rubbing between the structure of the labia, it can be painful and feel like penetration even when there is none.

{¶ 15} After the State rested its case, the defense presented its witnesses, including Artz, who denied sexually abusing either A. or L. At the close of trial, the jury deliberated and acquitted Artz of 21 counts of rape. However, the jury entered a guilty verdict for one count of rape of a minor under the age of 10 (Count 17), four counts of rape of a minor under the age of 13 (Counts 19, 21, 23, and 25), and two counts of gross sexual imposition (Counts 27 and 28). The single count of sexual imposition was previously dismissed by the State. Following the verdict, the trial court sentenced Artz to an aggregate term of 13 years to life in prison and gave him the appropriate sex offender designations. Artz now appeals from his conviction, raising seven assignments of error for review.

**First Assignment of Error - Manifest Weight of the Evidence**

{¶ 16} Artz's First Assignment of Error is as follows:

COUNTS 17, 19, 21, 23, [and] 25 IN THE INDICTMENTS MUST BE

REVERSED BECAUSE THEY ARE AGAINST THE MANIFEST WEIGHT

OF THE EVIDENCE.

{¶ 17} Under his First Assignment of Error, Artz challenges his five rape convictions under Counts 17, 19, 21, 23 and 25 as being against the manifest weight of the evidence. Specifically, Artz argues that there is no possible explanation for why the jury would choose to convict him of five counts of raping A., but acquit him of the other 21

counts of rape, when each count was identical, but for the time frame alleged, with the same evidence presented to support each charge. We disagree with Artz's characterization of the evidence.

{¶ 18} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." (Citations omitted.) *Martin* at 175.

{¶ 19} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "This court will not substitute its judgment for that of the trier

of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 20} "[I]nconsistencies between verdicts on separate counts do not necessarily mean that a jury made a mistake." *State v. Hawkins*, 2d Dist. Montgomery No. 21691, 2007-Ohio-2979, ¶ 24, citing *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). " '[E]ach count in an indictment charges a distinct offense and is independent of all other counts. Following that reasoning, * * * a jury's decision as to one count is independent of and unaffected by the jury's finding on another [count].' " *Id.* at ¶ 23, quoting *State v. Washington*, 126 Ohio App.3d 264, 276, 710 N.E.2d 307 (2d Dist.1998). (Other citation omitted.)

{¶ 21} As noted above, Artz was convicted of five counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides that: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." The term "sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). " 'Fellatio is committed by touching the male sex organ with any part of the mouth.' " *State v. Hudson*, 2d Dist. Montgomery No. 22793, 2009-Ohio-2776, ¶ 42, quoting *State v. Long*, 64 Ohio App.3d 615, 618, 582 N.E.2d 626 (9th Dist.1989). Each of the five counts of rape for which Artz was convicted alleged that Artz committed

fellatio on A. while at the N. residence on certain dates between January 1, 2006, and October 29, 2009, a time frame in which A. was in the fourth through seventh grades.

{¶ 22} The jury acquitted Artz of every count of rape alleging penile-vaginal/anal penetration. Artz claims this creates inconsistency in the jury verdict. However, after reviewing the record, we find that the jury's verdict was likely the result of A. testifying that she did not know whether Artz penetrated her anus or vagina, but only knew that it was painful. Moreover, during her forensic interview, A. stated that she "zoned out" during that time and did not specifically remember what happened. In addition, Dr. Vavul-Roediger testified that a child may misperceive penetration when an object is rubbing between the structure of the labia. Therefore, based on the foregoing, it is understandable why the jury may have been reluctant to find Artz guilty beyond a reasonable doubt of the counts of rape alleging penile-vaginal/anal penetration.

{¶ 23} The jury also acquitted Artz of each count of rape by fellatio that was alleged to have occurred before 2006. As noted above, while A. testified that she was unclear when the abuse had actually started, her testimony establishes that the abuse had started no later than 2006 when she was in the fourth grade, as that is when she made her first disclosure and realized the abuse was wrong. The fourth grade is also when A. discovered blood in her underwear at school, went to the school nurse, and eventually saw a doctor. Because the record indicates that A. started the fourth grade in 2006, her testimony regarding those events could have led a reasonable jury to conclude that the abuse had begun at least by her fourth grade year, thereby accounting for why the jury chose to only convict Artz of the counts of fellatio that were alleged to have occurred in 2006 and after.

{¶ 24} That said, having reviewed the entire record, we do not clearly find that the jury lost its way or created a manifest miscarriage of justice when it decided to convict Artz of rape by fellatio as alleged in Counts 17, 19, and 21. A.'s testimony establishes that while she was residing at the N. residence, Artz subjected her to a continuous routine of sexual abuse that occurred the same way every time it happened. This includes A.'s testimony that Artz forced her to perform fellatio on him over 25 times at the N. residence. A. testified that she resided at N. between the third and seventh grades. The record of A.'s birthdate indicates that A. was nine years old and in the fourth grade for at least a portion of the time frame alleged in Count 17, i.e., January 1, 2006 through October 29, 2006. In addition, the record indicates that A. was ten years old and in the fourth grade for at least a portion of the time frames alleged in Counts 19 and 21, i.e., October 30, 2006 through December 31, 2006, and January 1, 2007 through December 1, 2007.

{¶ 25} A reasonable jury could have found that A. was abused by Artz during these time periods because A.'s testimony indicates that the abuse occurred throughout her fourth grade year and that the abusive routine was initiated in at least three different ways. For example, A. testified that sometimes she was awake when Artz would enter her bedroom at night and other times she would be sleeping. If she was sleeping, Artz would either wake her up with his voice or by removing her blanket. A. also specifically recalled being awake on other occasions, as she noted that the condition of the carpet at the N. residence prevented Artz from shutting her bedroom door completely upon him entering her room. Therefore, while A. testified that the actual sexual abuse occurred the same way every time, the foregoing details would allow a jury to reasonably conclude that the abuse occurred on at least three specific occasions. That finding, combined with all the

details surrounding her fourth grade year, would further allow a reasonable jury to conclude the abuse occurred as alleged in Counts 17, 19, and 21.

{¶ 26} We also do not clearly find that the jury lost its way or created a manifest miscarriage of justice when it decided to convict Artz of rape by fellatio under Counts 23 and 25, which alleged Artz raped A. by fellatio at the N. residence between January 1, 2008 through December 31, 2008, and January 1, 2009 through October 29, 2009. A. testified that after Artz's second wife, D., moved out of the N. residence, Artz took her to his bedroom on two or three occasions and sexually abused her there as opposed to the usual location of her bedroom. A. testified that she was in the sixth grade when D. moved out of the N. residence and D. confirmed that she moved out in 2009. The record indicates that A. started her sixth grade year in the fall of 2008 and her seventh grade year in the fall of 2009. A. also testified that she disclosed the sexual abuse in the seventh grade to her friend, S.T., who later confirmed that information at trial.

{¶ 27} Given A.'s birthdate and based on the foregoing testimony, a reasonable jury could have concluded that the abusive routine also occurred during the time frames alleged in Counts 23 and 25. Again, A. specifically testified that on two or three occasions the abuse occurred in a different location around the time she was in the sixth grade and that she made a second disclosure regarding the abuse while in the seventh grade. These events would have occurred sometime during 2008 and 2009, and thus match the time frames alleged in Counts 23 and 25.

{¶ 28} In light of the foregoing, because this is not an exceptional case in which the evidence weighs heavily against the conviction, Artz's First Assignment of Error is overruled.

**Second Assignment of Error - Use of Identical Evidence to Support Differing**

**Counts of Rape**

{¶ 29} Artz's Second Assignment of Error is as follows:

THE USE OF IDENTICAL EVIDENCE TO SUPPORT DIFFERING COUNTS IN THE INDICTMENT VIOLATES THE APPELLANT'S RIGHT TO DUE PROCESS OF LAW.

{¶ 30} Under his Second Assignment of Error, Artz contends his right to due process was violated because the State did not present evidence at trial differentiating the identical counts of rape alleged in the indictment. He contends that this permitted him to be prosecuted and convicted for a generic pattern of abuse rather than for each incident of abuse alleged. In support of his argument, Artz relies on the holding in *Valentine v. Konteh*, 395 F.3d 626 (6th Cir.2005), and claims the present case is identical to *Valentine*. We disagree.

{¶ 31} In *Valentine*, the defendant was convicted of 20 counts of rape of a child, each of which was identically worded, and of 20 counts of felonious sexual penetration, each of which was also identically worded. *Id*. at 628. All 40 counts were alleged to have occurred during the same 11-month time period. *Id*. at 629. The Sixth Circuit reversed all but one of Valentine's rape convictions and one of the sexual penetration convictions, finding that the prosecution "did not distinguish the factual bases of these charges in the indictment, in the bill of particulars, *or even at trial*." (Emphasis added.) *Id*. at 628. In so holding, the *Valentine* court found that notice and double jeopardy issues were created because the defendant "had notice that he was charged with two

separate crimes during the period of time specified in the indictment. But he had no way to otherwise identify what he was to defend against in the repetitive counts and no way to determine what charges of a similar nature could be brought against him in the future if he were re-indicted." *Id.* at 628-29.

{¶ 32} Noting the lessened requirement of specificity in regards to date and time for indictments alleging sexual offenses against children, the court in *Valentine* stated that:

> The problem in this case is not the fact that the prosecution did not provide the defendant with exact times and places. If there had been singular counts of each offense, the lack of particularity would not have presented the same problem. *Instead, the problem is that within each set of 20 counts, there are absolutely no distinctions made.* [The defendant] was prosecuted for two criminal acts that occurred twenty times each, rather than for forty separate criminal acts. In its charges and *in its evidence before the jury, the prosecution did not attempt to lay out the factual bases of forty separate incidents that took place.*

(Emphasis added.) *Valentine*, 395 F.3d at 632.

{¶ 33} The court in *Valentine* further advised that testimony or a bill of particulars differentiating the multiple counts may rectify the issues caused by identical indictments, stating that, in such a situation, "[t]he due process problems in the indictment might have been cured had the trial court insisted that the prosecution delineate the factual bases for [each separate incident] either before or during the trial." *Id.* at 634. However, in *Valentine*, the prosecution's charges and evidence presented before the jury did not lay

out the factual bases of forty separate incidents that took place. Instead, the 8-year-old victim described "typical" abusive behavior by the defendant and estimated how often the "typical" abuse occurred. *Id.* at 632-633.

{¶ 34} Although *Valentine* has no binding effect on Ohio courts, this court has cited *Valentine* and reached the same conclusion regarding the need to differentiate multiple counts of abuse at trial or through a bill of particulars*. See, e.g., State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 24; *State v. Tobin*, 2d Dist. Greene No. 2005 CA 150, 2007-Ohio-1345, ¶ 10-17. Challenges based on *Valentine* have been rejected where the testimony and/or a bill of particulars provided sufficient differentiation among the counts of sexual abuse. *See, e.g., State v. Chaney*, 3d Dist. Seneca No. 13-07-30, 2008-Ohio-3507, ¶ 52-53 (through the bill of particulars and the testimony, the State was able to adequately differentiate multiple counts of rape so as to comply with due process requirements); *State v. Yaacov*, 8th Dist. Cuyahoga No. 86674, 2006-Ohio-5321, ¶ 21 (there was sufficient differentiation among the counts based on the victim's ability to recall when, where, and how the abuse occurred); *State v. Cunningham*, 8th Dist. Cuyahoga No. 89043, 2008-Ohio-803, ¶ 38 (distinguishing *Valentine* because the State presented evidence at trial to differentiate each of the five counts for which defendant was convicted); *State v. Crosky*, 10th Dist. Franklin No. 06AP-655, 2008-Ohio-145, ¶ 93 (distinguishing *Valentine* because the indictment differentiated multiple rape counts by time and/or type of sexual conduct and the victim's testimony provided a time frame for each offense).

{¶ 35} In this case, there are identical counts of rape alleged in Artz's indictment and no bill of particulars. However, the instant case is distinguishable from *Valentine*

because, contrary to Artz's claim otherwise, the testimony presented at trial provided sufficient differentiation among the five counts of rape for which Artz was convicted. While A.'s testimony indicated that Artz abused her in the same manner every time and provided an estimate for how many times the routine of abuse occurred, unlike *Valentine*, A. provided other details in her testimony that distinguished the counts, which we have discussed at length under Artz's First Assignment of Error.

{¶ 36} Furthermore, the record clearly establishes that the jury instructions and verdict forms were framed in such a manner that each count could be contemplated separately, as each count delineated the distinct time frames, locations, and type of sexual conduct alleged. Moreover, the fact that the jury acquitted Artz of some, but not all of the rape charges indicates that there was differentiation among the counts. *See State v. Johnson*, 8th Dist. Cuyahoga No. 91900, 2009-Ohio-4367, ¶ 43.

{¶ 37} Artz's Second Assignment of Error is overruled.

**Third and Fourth Assignments of Error - Jury Instruction on Course of Criminal Conduct**

{¶ 38} For purposes of convenience and clarity, we will address Artz's Third and Fourth Assignments of Error together. They are as follows:

III. A COURSE OF CONDUCT CANNOT BE USED TO CONVICT A DEFENDANT FOR ACTS FOR WHICH THE ONLY EVIDENCE SUPPORTING THESE ACTS HAS BEEN REJECTED BY THE JURY AND THUS THE CONVICTION IS BASED ONLY ON OTHER BAD ACTS EVIDENCE.

IV. THE COURT'S COURSE OF CONDUCT INSTRUCTION VIOLATED THE APPELLANT'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO A FAIR TRIAL UNDER THE SEVENTH AMENDMENT.

{¶ 39} Under his Third and Fourth Assignments of Error, Artz challenges the jury instruction on course of criminal conduct that was given in relation to one of the two gross sexual imposition charges concerning A.'s younger sister L. (Count 28). Artz claims the framework of the instruction is confusing in that it could have led the jury to convict him of charges involving A., which he claims would have amounted to a conviction based on evidence of other bad acts contrary to Evid.R. 404(B). As a result, Artz also claims that the instruction violated his right to due process and a fair trial. We again disagree.

{¶ 40} "Generally, a trial court should give a requested jury instruction if it is a correct statement of the law as applied to the facts of the particular case." (Citation omitted.) *State v. Frazier*, 2d Dist. Clark No. 2008 CA 118, 2010-Ohio-1507, ¶ 37. "In charging the jury, the court must state to it all matters of law necessary for the information of the jury in giving its verdict." R.C. 2945.11. "Our review concerning whether jury instructions correctly state the law is de novo." (Citation omitted.) *Frazier* at ¶ 37.

{¶ 41} Despite claiming otherwise in his brief, Artz did not object to the course of criminal conduct jury instruction when it was proposed by the State or when the trial court gave the instruction to the jury. Accordingly, Artz has waived all but plain error. *State v. Skatzes*, 2d Dist. Montgomery No. 15848, 2003-Ohio-516, ¶ 67; *State v. Thomas*, 170 Ohio App.3d 727, 2007-Ohio-1344, 868 N.E.2d 1061, ¶ 15 (2d Dist.) "Plain error is

demonstrated when a 'manifest miscarriage of justice' results from an improper jury instruction." *Thomas* at ¶ 16, quoting *State v. Recker*, 3d Dist. Putnam Nos. 12-05-21 and 12-05-22, 2007-Ohio-216, ¶ 11.

{¶ 42} In this case, the course of criminal conduct instruction was requested by the State because L. testified that Artz touched her vagina and buttocks while at his parent's house and while in an out-of-state hotel when she traveled with him for his job as a package delivery driver. In order for the jury to determine whether the out-of-state charge was properly venued in Montgomery County, a written instruction regarding course of criminal conduct was provided to the jury reciting language from R.C. 2901.12(H). The written instruction stated as follows:

**"Course of Criminal Conduct"** (H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:

(1) The offenses involved the same victim, or victims of the same type or from the same group.

(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.

(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.

(4) The offenses were committed in furtherance of the same conspiracy.

(5) The offenses involved the same or a similar modus operandi.

(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

Court's Exhibit I, Charge to the Jury, p. 26.

{¶ 43} Not only is the foregoing instruction a correct statement of law, but the trial court's oral instruction to the jury also made it clear that the instruction only concerned the out-of-state gross sexual imposition charge under Count 28. Specifically, the trial court stated, in pertinent part, as follows:

Ladies and gentlemen, with regard to count—the last Count, XXVIII, you're—that's a gross sexual imposition count, if you recall and that one— it's regarding [L.] and it's the out-of-state, distinguish that count from the other count on gross sexual imposition. As I'm sure you've heard me say many times, in Montgomery County, Ohio. This is—this one is a little different. The law does allow—what's—it's called a course of criminal conduct. So, this instruction applies to Count XXVIII. When an offender as a part of a course of criminal conduct commits offenses in a different jurisdiction, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses, or any element of one of those offenses, occurred. So since one of the incidents occurred in Montgomery County with regard to L., then the defendant can be tried in Montgomery County even for an event that occurred in a jurisdiction outside Montgomery County, Ohio, if you find that it was part of a course of criminal conduct.* * *

Trial Trans. Vol. IV (Sept. 3, 2014), p. 713-714.

{¶ 44} Because the instruction was a correct statement of law and pertinent to the facts of this case, and because there was no potential for confusion as alleged by Artz, we find no error, let alone plain error, in the course of criminal conduct instruction provided to the jury. Likewise, by giving the instruction, the trial court did not, in any way, violate Artz's right to due process and a fair trial.

{¶ 45} Artz's Third and Fourth Assignments of Error are overruled.

**Fifth Assignment of Error – Trial Court's Failure to Declare a Mistrial or Question the Jury**

{¶ 46} Artz's Fifth Assignment of Error is as follows:

THE COURT ERRED IN NOT DECLARING A MISTRIAL OR INQUIRING AS TO WHETHER A MISTRIAL WAS NECESSARY WHEN TWO JURY MEMBERS ATTENDED A WEDDING OF SOMEONE ASSOCIATED WITH THE PROSECUTOR'S OFFICE.

{¶ 47} Artz's Fifth Assignment of Error relates to a disclosure by one of the prosecutors on the last day of trial indicating that the prosecutor had attended a wedding over the weekend that was also attended by one of the jurors.[1] The record indicates that the prosecutor assured the trial court and defense counsel that he did not speak to the juror at the wedding, nor speak to anyone about the case. Following the disclosure, the defense did not request that any of the jurors be questioned nor move for a mistrial.

---

[1] Artz incorrectly states in his brief that two jurors were at the wedding and that one of the jurors disclosed the incident to the trial court as opposed to the prosecutor.

Instead, the defense asked for the juror at issue to be replaced by the alternate. The trial court granted that request and there was no further discussion on the matter. Despite dismissing the juror as requested, Artz now claims that the trial court erred in failing to sua sponte declare a mistrial or, alternatively, question the other jurors to confirm the jury was untainted. Once again, we disagree.

{¶ 48} "A trial court may grant a mistrial sua sponte when there is manifest necessity for the mistrial or when 'the ends of public justice would otherwise be defeated.' " *State v. Howard*, 2d Dist. Montgomery No. 18884, 2002 WL 1332522, *3 (June 14, 2002), quoting *Cleveland v. Walters*, 98 Ohio App.3d 165, 168, 648 N.E.2d 37 (8th Dist.1994). Therefore, "[t]he cardinal rule governing declaration of a mistrial is that before doing so the court must engage in a scrupulous search for alternatives to deal with the problem concerned, and that the search must reveal a manifest necessity for a mistrial and/or that failure to order a mistrial would defeat the ends of justice. In other words, a mistrial should only be ordered as a last resort." (Citations omitted.) *State v. Gunnell*, 2d Dist. Clark No. 09-CA-0013, 2010-Ohio-4415, ¶ 193.

{¶ 49} Because Artz did not move for a mistrial, the trial court's failure to grant a mistrial sua sponte is judged under a plain error standard. *Howard* at *3. Likewise, since Artz did not request the trial court to question the jury regarding any possible bias or influence as a result of the juror attending the wedding, the trial court's failure to sua sponte inquire about that matter is also judged under a plain error standard. *State v. Ellison*, 2d Dist. Montgomery No. 25638, 2013-Ohio-5455, ¶ 27.

{¶ 50} Upon review, we conclude that the trial court did not err, plainly or otherwise, when it failed to sua sponte declare a mistrial or question the jury. The trial court had a

reasonable alternative to declaring a mistrial, as it granted Artz's request to replace the juror at issue with the alternate. Therefore, there was no cause for a mistrial, as any potential for bias in favor of the State was removed with the dismissal of the juror. In addition, Artz has not demonstrated that the outcome of trial would have been any different had the trial court decided to sua sponte question the jury regarding possible bias or influence arising out of the challenged juror attending the wedding. Simply stated, Artz cannot show that the other jurors were even aware that the juror had attended the wedding or that such knowledge influenced the verdicts. Accordingly, we find his claim lacks merit.

{¶ 51} Artz's Fifth Assignment of Error is overruled.


**Sixth Assignment of Error - Admissibility of Expert Witness Testimony**

{¶ 52} Artz's Sixth Assignment of Error is as follows:

AN EXPERT WITNESS MUST DERIVE HER OPINION FROM FACTS OR DATA OF THE PARTICULAR CASE UPON WHICH THE EXPERT BASES AN OPINION OR INFERENCE OTHER WISE [sic] SUCH TESTIMONY VIOLATES EVID.R. 403.

{¶ 53} Under his Sixth Assignment of Error, Artz contends the trial court erred by admitting the expert testimony of Dr. Brenda Joyce Miceli, a clinical child psychologist, who testified at trial regarding the behavioral characteristics of children who have been sexually abused. Specifically, Artz claims that since Dr. Miceli was unfamiliar with the victims or alleged abuse in this case, her testimony was inadmissible under Evid.R. 702, 703, and 705, and improperly bolstered the victims' testimony. We disagree.

{¶ 54} An appellate court reviews the admission of expert testimony for an abuse of discretion. (Citation omitted.) *State v. Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401, ¶ 30. " 'Abuse of discretion' suggests unreasonableness, arbitrariness, or unconscionability. Without those elements, it is not the role of this court to substitute its judgment for that of the trial court." (Citation omitted.) *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9.

{¶ 55} Evid.R. 702 governs the admissibility of expert testimony, and it provides as follows:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

{¶ 56} Pursuant to Evid.R. 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." Evid.R. 705 provides that "[t]he expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."

{¶ 57} The Ohio Supreme Court has found that testimony from a psychologist regarding the behavioral characteristics of sexually abused children is admissible. *State v. Stowers*, 81 Ohio St.3d 260, 262, 690 N.E.2d 881 (1998). An expert psychologist's training and professional experience provides the expert with specialized knowledge of the kind recognized under Evid.R. 702 that the average person lacks about behavioral characteristics of minor victims of sexual abuse. *State v. Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280, ¶ 56 (2d Dist.), citing *Stowers*. Also admissible is expert testimony regarding the behavior and modus operandi of those who sexually abuse children. *See State v. Cox*, 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 56. However, "[w]hat an expert may not do is offer a direct opinion on whether a child is telling the truth." *State v. Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 42, citing *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), syllabus.

{¶ 58} We have addressed the issue raised by Artz on multiple occasions. *See Zimpfer* at ¶ 27-37; *Cox* at ¶ 49-57; *Bell* at ¶ 44-58. In *Bell*, Dr. Miceli was retained by the State "to testify regarding the wide range of behaviors that sexually abused children may exhibit, including internalizing behaviors, externalizing behaviors, and sexualized behaviors." *Bell* at ¶ 45. Because Dr. Miceli did not opine on whether the victims were sexually abused by the defendant, we concluded that the trial court did not abuse its discretion in admitting her testimony, and stated the following:

> Dr. Miceli simply offered her opinions regarding the wide range of behavioral
> characteristics displayed by minor victims of sexual abuse. The law clearly
> permits this kind of expert testimony, and Dr. Miceli did not go beyond
> permissible boundaries and opine whether these children were in fact

abused by Bell. A thorough review of Dr. Miceli's expert testimony establishes that she possessed specialized knowledge that could aid a trier of fact in assessing whether the children actually suffered sexual abuse.

*Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280 at ¶ 57.

**{¶ 59}** In support of his argument that Dr. Miceli's testimony was inadmissible, Artz cites to former Ohio Supreme Court Justice Alice Robie Resnick's dissent in *Stowers*. Justice Resnick asserted in *Stowers* that an expert witness' testimony regarding whether the behavior of an alleged victim of child abuse is consistent with the behavior observed in sexually abused children "should be inadmissible until it is scientifically established that there are proven and accepted behavioral characteristics of a standard child-sexual-abuse victim." *Stowers*, 81 Ohio St.3d at 262, 690 N.E.2d 881. We have declined to accept this argument in the past, stating that:

The difficulty with this argument is that [it] represents a minority position and is not the law in the State of Ohio. In the instant case, Dr. Miceli permiss[i]bly testified regarding some of the behaviors that sexually abused children may exhibit, including the tendency to delay the reporting of sexual abuse, as was the case here. Dr. Miceli also offered testimony regarding the tendency of children who have been sexually abused to only provide partial reports of the alleged abuse which is permissible under *Stowers* and its progeny.

*Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401 at ¶ 32.

**{¶ 60}** We have also previously addressed the argument that Dr. Miceli failed to disclose the facts and data used as a basis for her opinion as required by Evid.R. 703

and 705. *See Zimpfer* at ¶ 33; *Cox,* 2d Dist. Montgomery No. 25477, 2013-Ohio-4941 at ¶ 53. In *Zimpfer* and *Cox* we stressed that Dr. Miceli did not offer an opinion as to whether the victims in those cases had been abused. *Id.* Rather, Dr. Miceli's testimony was correctly limited to a specialized overview of particular behavioral characteristics of sexually abused children in order to give the jurors a better understanding of those characteristics. *Id.* In *Cox*, Dr. Miceli also testified regarding the behavior and modus operandi of the abuser. *Cox* at ¶ 56. We found Dr. Miceli's testimony in both those cases admissible to aid the jury in assessing whether the victims at issue actually suffered sexual abuse at the hands of the defendants. *Zimpfer* at ¶ 33; *Cox* at ¶ 53, 56.

**{¶ 61}** The instant case is analogous to *Zimpfer*, *Cox*, and *Bell* in that Dr. Miceli never offered her opinion as to whether the abuse occurred and her testimony was simply an aid for the jury to better understand the characteristics of child abuse. Dr. Miceli's testimony establishes that she possesses an extensive formal education on the subject of child abuse and that she has an extensive history working with sexually abused children. After examining the record, we find nothing that would call into question the reliability of her testimony, as her testimony has a reliable basis in the knowledge and experience of the field of psychology, which she has acquired from the classroom and the clinic. In so holding, we note that there is nothing in the *Zimpfer*, *Cox* and *Bell* decisions indicating that Dr. Miceli was familiar with the specific victims in each of those cases. Accordingly, we do not find it relevant in this case that Dr. Miceli was unfamiliar with A. and L. or their allegations of abuse, as her testimony was limited to the behavioral characteristics of sexually abused children and their abusers.

**{¶ 62}** Artz also argues that the State called Dr. Miceli to testify solely to bolster A.

and L.'s testimony. However, there is a distinction "between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused." *Stowers*, 81 Ohio St.3d at 262, 690 N.E.2d 881; *Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404 at ¶ 42. "Expert testimony is admissible as to the latter." (Footnote omitted.) *Rosas* at ¶ 42. That is, testimony that provides "additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity" is admissible. (Emphasis sic.) *Stowers* at 262. Such testimony " 'does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination.' " *Id.* at 263, quoting *State v. Gersin*, 76 Ohio St.3d 491, 494, 668 N.E.2d 486 (1996).

**{¶ 63}** Here, Dr. Miceli's testimony is within permissible bounds. She testified about the behavioral characteristics of sexually abused children in an effort to educate the jury on topics such as delayed reporting. Accordingly, her testimony does not improperly bolster A. and L.'s testimony and is not prejudicial as alleged by Artz.

**{¶ 64}** Artz's Sixth Assignment of Error is overruled.

## Seventh Assignment of Error – Cumulative Error

**{¶ 65}** Artz's Seventh Assignment of Error is as follows:

CUMULATIVE ERRORS REQUIRE THE REVERSAL OF THIS CONVICTION.

**{¶ 66}** Under his final assignment of error, Artz contends that the cumulative effect of all the errors he alleged in his appeal denied him a fair trial and warrants the reversal

of his conviction. Indeed, under the doctrine of cumulative error, the Supreme Court of Ohio has held that "a conviction will be reversed when the cumulative effect of errors in a trial deprives the defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." (Citations omitted.) *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 258. However, in this case, Artz has failed to demonstrate that any error occurred during the trial court proceedings, let alone multiple errors; accordingly, the cumulative error doctrine is not applicable here.

**{¶ 67}** Artz's Seventh Assignment of Error is overruled.

## Conclusion

**{¶ 68}** Having overruled all seven assignments of error raised by Artz, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, P.J. and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
George A. Katchmer
Hon. Timothy N. O'Connell